**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| COVENTRY DELI; JOSEPH ANTHONY HAIR STUDIO INC.; VAN JOE LLC DBA JOSEPH ANTHONY RETREAT SPA AND DRY BAR;  and STECK EYE CARE LLC individually and on behalf of all others similarly situated, | Judge: _____ |
| Plaintiffs, | Civil Action No. _____ |
| v. | JURY TRIAL DEMANDED |
| STATE AUTO PROPERTY AND CASUALTY INSURANCE CO., | |
| Defendant. | |

**PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT**

Plaintiffs Coventry Deli, Joseph Anthony Hair Studio, Inc., Van Joe LLC DBA Joseph Anthony Retreat Spa and Dry Bar; and Steck Eye Care LLC (collectively "Plaintiffs"), individually and on behalf of the other members of the below-defined nationwide classes (collectively, the "Class"), bring this class action against Defendant State Auto Property and Casualty Insurance Company ("State Auto"), and in support thereof state the following:

## I.    NATURE OF THE ACTION

1.    Plaintiff Coventry Deli owns and operates a well-known Mom and Pop delicatessen located in a high-rise office building in the heart of the Philadelphia, Pennsylvania business district.

2.    Plaintiff Joseph Anthony Hair Studio Inc. ("Joseph Anthony Hair Studio") has

built a reputation as the premiere day spa in Glen Mills and Center City Philadelphia offering a host of salon, spa, and med spa services.

3.     Plaintiff Van Joe LLC DBA Joseph Anthony Retreat Spa and Dry Bar ("Van Joe") is a full-service salon and spa specializing in body treatments and facials, blowouts, and conditioning treatments at its dry bar along with manicure and pedicure applications.  It specializes in bridal and event services located within the Springfield Country Club in Springfield, Pennsylvania.

4.     Plaintiff Steck Eye Care LLC ("Steck Eye Care") is a family owned and operated eye care clinic located in the Mayfair Mall.  Steck proudly provides professional, high-quality, and convenient eye care to the local community of Wauwatosa, Wisconsin and beyond through its partnership with Lens Crafters.

5.     But Plaintiffs' existence is now threatened by SARS-CoV-2, sometimes called "Coronavirus" or by one of the names of the disease that it causes and that spreads it "COVID-19."  For ease of reference, SARS-CoV-2 will be referred to as COVID-19 herein.

6.     Due to COVID-19, the resulting pandemic and/or the related closure orders, Plaintiffs' and the class members' properties have suffered "direct physical loss or damage"— under the plain and ordinary meaning of that term—because COVID-19 made the properties unusable in a way that they had been used before COVID-19.

7.     Instead of being able to pack customers in for breakfast and lunch at the office building in which Coventry Deli is situated, the deli has been left with no choice but to discontinue its operations due to its status as a non-essential or non-life-sustaining business under the Pennsylvania Governor's closure order and subsequently due to the presence of COVID-19 on its premises and throughout the office building in which it is located.  At the same

time, because of the proximity of salon and spa stations to one another, both Joseph Anthony Hair Studio, Inc. and Van Joe LLC have been forced to drastically alter their premises in an attempt to reduce and minimize the spread of COVID-19. Similarly, instead of being able to fill their eye care clinic with employees and customers, Steck Eye Care was forced to drastically reduce operations at its office, and even to close entirely. Steck Eye Care further introduced plexiglass and ultra-violet light cleaning procedures in its clinic and purchased new refraction equipment to increase the distance between optometrist and patient. For Plaintiffs to do otherwise would lead to the continued emergence or re-emergence of COVID-19 at their properties. Until COVID-19 was brought a bit more under control, even limited operations were not possible.

8. This loss is "direct"[1]—Plaintiffs are not asking State Auto to reimburse them after someone obtained a judgment against them for getting them sick. That might be an indirect loss. Rather, Plaintiffs are asking State Auto to pay for their loss of business income occasioned directly by being unable to use their properties for their intended business function. Further, COVID-19 was not only a substantial factor in causing the loss, it also was the predominant or immediate factor in causing the loss or damage: COVID-19 was close in proximity to the loss or damage, such that any ordinary person would think that the loss or damage was in the zone of danger of COVID-19.

9. This loss is physical.[2] COVID-19 structurally altered the surfaces of the covered properties and ambient air within the covered properties. Plaintiffs are unable to use their

---

[1] "Direct," as an adjective, is often defined as something "characterized by close logical, causal or consequential relationship" or something "marked by absence of an intervening agency, instrumentality, or influence" or something "proceeding from one point to another in time or space without deviation or interruption." https://www.merriam-webster.com/dictionary/direct.

[2] Relevant definitions of "physical" make clear that the term describes something "having material existence" or something "perceptible especially through the senses."

interior spaces in the manner in which they had previously used those spaces. The probability of illness prevents the use of the space in no less of a way than, on a rainy day, a crumbling and open roof from the aftermath of a tornado would make the interior space of a business unusable.[3]

10. Civil authority closure orders in Pennsylvania and Wisconsin ("Closure Orders") imposed a physical limit on Covered Property, *e.g.*, by limiting restaurant, spa, fitness, and other operations from using 100% of their physical space, even when they were not totally shutdown. A court's recent reasoning regarding restaurants applies as well to all of Plaintiffs' capacity-limited operations. "It is not as if the shut-down orders imposed a financial limit on the restaurants by, for example, capping the dollar-amount of daily sales that each restaurant could make."[4] Plaintiffs have been unable to fully use their physical spaces. The Policies define "Covered Property" to include real and personal property, including fixtures and permanently installed machinery and equipment. Thus, a physical loss of property necessarily includes the lost physical space that Plaintiffs can no longer fully utilize due to COVID-19 and the Closure Orders—even though some tables and chairs, equipment, etc. remain physically intact. "Another way to understand the physical nature of the loss inflicted by the shut-down orders is to consider how a restaurant might mitigate against the suspension of operations caused by, say, a 25%-capacity limitation on the number of guests inside the restaurant. If the restaurant could expand its physical space, then the restaurant could serve more guests and the loss would be mitigated

---

https://www.merriam-webster.com/dictionary/physical.

[3] Note, however, that Plaintiffs are not seeking recovery for their loss of use. Plaintiffs and the Class members are seeking coverage for their loss of business income. Here's an example that drives home the difference: some law firms have been unable to use their office space because of COVID-19, but nevertheless the law firms' business income has increased and they thus have faced no loss of business income. A claim by such a law firm for not being able to use its office space would be a "loss of use" claim. The law firm would have no loss of business income claim. Here, Plaintiffs' business has decreased because of the impairment of their properties, and Plaintiffs are seeking the loss of business income under the business interruption coverage of their property insurance policies.

[4] *In re: Society Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, No. 20 C 02005, 2021 WL 679109, at *9 (N.D. Ill. Feb. 22, 2021).

(at least in part). The loss is physical—or at the very least, a reasonable jury can make that finding."[5]

11. This loss is a loss. It is the loss of functionality of the spaces for business purposes. It is the diminishment of the physical spaces in the buildings. What once could hold many now can safely hold only a few. It is the injury and structural change to ambient air within covered property and the surfaces of Covered Property.

12. The impairment of the business function is also damage to Plaintiffs' and the Class members' respective businesses.[6]

13. To protect their businesses in the event that they suddenly had to suspend operations for reasons outside of their control, or if they had to act in order to prevent further property damage, Plaintiffs purchased insurance coverage from State Auto, including commercial property coverage, as set forth in State Auto's Businessowners Special Property Coverage Form.

14. The Territory of the Policies is the United States of America (including its territories and possessions); Puerto Rico and Canada.

15. Covered Property includes "Buildings, meaning the buildings and structures at the premises described in the Declaration, including: (1) Completed additions; (2) Fixtures, including outdoor fixtures; (3) Permanently installed (a) Machinery; and (b) Equipment" and also includes personal property owned by the insured that is used to maintain or service the buildings or structures or the premises, materials, equipment supplies and temporary structures on or within 100 feet of the described premises used for making additions, alterations or repairs

---

[5] *Id.*

[6] Damage is often defined simply as "loss or harm resulting from injury," but it is also defined as expense and cost. Synonyms for "damage" include "impairment," "deprivation," and "detriment." https://www.merriam-webster.com/dictionary/damage and https://www.thesaurus.com/browse/damage?s=t

to the building or structures and the personal property of guests, other patrons, and customers while on Covered Property.  Coverage is also extended to cover additional property and interests which may be acquired or made at the insured's expense but cannot legally be removed.

16.     Plaintiffs required "all risk" property coverage to protect them in the event that their businesses suddenly had to interrupt operations for reasons outside of their control, or if they had to act in order to prevent further property damage.  Plaintiffs obtained this coverage as an Insureds under the Policies, which include the coverages, as described below, for Business Income, Extra Expense, Civil Authority, Sue and Labor and Contagious or Infectious Disease.

17.     Unlike many policies that provide Business Income coverage, the Policies do not include, and are not subject to, the industry's standard "Exclusion of Loss Due to Virus or Bacteria."

18.     State Auto's Businessowners Special Property Coverage Form provides "Business Income" coverage promises to pay for loss due to the necessary suspension of an Insured's "operations" following loss to property.

19.     The Businessowners Special Property Coverage Form further provides "Extra Expense" coverage, which promises to pay the expense incurred to minimize the suspension of business and to continue operations.

20.     State Auto's Businessowners Special Property Coverage Form also provides "Civil Authority" coverage, which promises to pay for loss caused by the action of a civil authority that prohibits access to the insured premises because of damage at other property.

21.     State Auto's Businessowners Special Property Coverage Form, under a section entitled "Duties in the Event of Loss or Damage" mandates that State Auto insureds "must see that the following are done in order for coverage to apply. . . [t]ake all reasonable steps to protect

the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim." This is referred to as "Sue and Labor" coverage.

22.     State Auto's Contagious or Infectious Disease Coverage Form, contained within the policies for its restaurant and food service policyholders, provides coverage for the suspension of "operations" at the described premises due to the order of a civil authority …from the actual or alleged: Exposure of the described premises to a contagious or infectious disease.

23.     Unlike many policies that provide Business Income coverage (also referred to as "business interruption" coverage), State Auto's Businessowners Special Property Coverage Form does not include, and is not subject to, any exclusion for losses caused by viruses.

24.     Plaintiffs were forced to suspend and/or reduce business at their properties due to COVID-19 and the resultant closure orders issued by civil authorities in Pennsylvania and Wisconsin, mandating the suspension of business, as well as in order to take necessary steps to prevent further damage and minimize suspension of business and continue operations.

25.     Upon information and belief, State Auto has, on a widescale and uniform basis, refused to pay its insureds under its Business Income, Extra Expense, Civil Authority, Sue and Labor, and Contagious or Infectious Disease Coverage coverages for losses suffered due to COVID-19, any orders by civil authorities that have required the necessary suspension of business, and any efforts to prevent further property damage or to minimize the suspension of business and continue operations.  Indeed, Plaintiffs were told by their insurance agents that State Auto would not pay under their policies for the losses Plaintiffs suffered due to COVID-19 and the resultant civil authority orders, and State Auto denied Plaintiffs' claims under Plaintiffs' respective policies.

## II.     JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because Defendant and at least one member of the Class are citizens of different states and because: (a) the Class consists of at least 100 members; (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs; and (c) no relevant exceptions apply to this claim.

27.     Venue is proper in this District under 28 U.S.C. § 1391, because Defendant resides in this District and a substantial portion of the acts and conduct giving rise to the claims occurred within the District.

## III.     PARTIES

### A.  Plaintiffs

28.     Plaintiff Coventry Deli is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

29.     Plaintiff Joseph Anthony Hair Studio Inc. is a Pennsylvania corporation with its principal places of business in Glen Mills and Philadelphia, Pennsylvania.

30.     Plaintiff Van Joe LLC DBA Joseph Anthony Retreat Spa and Dry Bar is a Pennsylvania limited liability company with its principal place of business in Springfield, Pennsylvania.

31.     Plaintiff Steck Eye Care LLC is a Wisconsin limited liability company with its principal place of business in Wauwatosa, Wisconsin.

### B.  Defendant

32.     Defendant State Auto an insurance company organized under the laws of Iowa, with its principal place of business in Columbus, Ohio.  It is authorized to write, sell, and issue insurance policies providing property and business income coverage in all 50 states, as well as

8

the District of Columbia and Puerto Rico. At all times material hereto, State Auto conducted and transacted business through the selling and issuing of insurance policies within Ohio.

## IV. FACTUAL BACKGROUND

### A. The Businessowners Special Property Coverage Form

33.    In return for the payment of a premium, State Auto issued to Coventry Deli Renewal Policy Number BOP 2934541 01 for the policy period of June 1, 2019 to June 1, 2020 and Businessowners Renewal Policy Number BOP 2934541 02 for a policy period of June 1, 2020 to June 1, 2021, both of which included The Businessowners Special Property Coverage Form. The original 2018-2019 policy with all forms and endorsements is attached hereto as **Exhibit A**. The subsequent renewal form for Policy Numbers BOP 2934541 01 and BOP 2934541 02 are attached hereto, respectively, as **Exhibit B and C**.

34.    Coventry Deli has performed all of its obligations under Policy Numbers BOP 2934541 01 and BOP 2934541 02, including the payment of premiums. The Covered Property, with respect to the Businessowners Special Property Coverage Form, is Coventry Deli, 2000 Market Street, Philadelphia, Pennsylvania 19103.

35.    In return for the payment of a premium, State Auto issued to Joseph Anthony Hair Studio Inc., and Van Joe LLC DBA Joseph Anthony Retreat Spa and Dry Bar, Businessowners Renewal Policy Number BOP 2847543 04 S for a policy period of June 25, 2019 to June 25, 2020 and Renewal Policy Number 2847543 05 S for a policy period of June 25, 2020 to June 25, 2021, both of which include the Businessowners Special Property Coverage Form. The original 2015-2016 policy with all forms and endorsements is attached hereto as **Exhibit D** and the 2019-2020 and 2020-2021 policies are attached hereto as **Exhibits E and F,** respectively.

9

36.     In return for the payment of a premium, State Auto issued to Steck Eye Care LLC Businessowners Renewal Policy Number Renewal Policy Number BOP 2462397 12 for a policy period of August 25, 2019 to August 25, 2020 which includes the Businessowners Special Property Coverage Form. This policy has been in place since 2007. The 2019-2020 Renewal Policy is attached hereto as **Exhibit G**.

37.     In many parts of the world, property insurance is sold on a specific peril basis. Such policies cover a risk of loss if that risk of loss is specifically listed (*e.g.*, hurricane, earthquake, H1N1, etc.).  Most property policies sold in the United States, however, including those sold by State Auto, are all-risk property damage policies.  These types of policies cover all risks of loss except for risks that are expressly and specifically excluded.  With respect to the Businessowners Special Property Coverage Form provided to Plaintiffs, State Auto agreed to pay "Covered Causes of Loss," meaning direct loss to Covered Property unless the loss is excluded or limited by the policies.

38.     In Plaintiffs' and the Class members' policies, State Auto did not exclude or limit coverage for losses from the spread of viruses.

39.     Losses due to COVID-19 are a Covered Cause of Loss under the State Auto policies within the Businessowners Special Property Coverage Form.

40.     In the Businessowners Special Property Coverage Form, State Auto agreed to pay for its insureds actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration" caused by direct physical loss of or damage to property at the described premises.  A slowdown or cessation of business activities at the Covered Property is a "suspension" of operations under the policies for which State Auto agreed

10

to pay for loss of Business Income during the "period of restoration" that begins 72 hours after the time of loss and immediately after the loss for Extra Expense Coverage.

41.    "Business Income" means net income (Net Profit or Loss before income taxes) that Plaintiffs and the other Class members would have earned or incurred, as well as continuing normal operating expenses incurred, including payroll.

42.    The Period of Restoration is the period of time that "**a**. Begins: **(1)** 72 hours after the time of direct physical loss or damage for Business Income Coverage; or **(2)** Immediately after the time of direct physical loss or damage for Extras Expense Coverage; caused by or resulting from any Covered Cause of Loss at the described premises; and **b.** Ends on the earlier of **(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or **(2)** The date when business is resumed at a new permanent location."

43.    Plaintiffs' and the other Class members' properties have suffered direct physical loss or damage.  Due to SARS-CoV-2 or COVID-19, their properties have become unsafe for their intended purpose and thus have suffered physical loss or damage.  Their properties' business functions have been impaired.  If they were to conduct business as usual, the disease and virus would show up and people would get sick.  This is not a non-physical or remote loss such as one occasioned by a breach of contract, loss of a market, or the imposition of a governmental penalty.  It is a direct physical loss.  In its current condition, Plaintiffs' and the other Class members' properties are not functional for their business purposes.

44.    The presence of virus or disease can constitute physical damage to property, as the insurance industry has recognized since at least 2006, and as has happened here.  When preparing so-called "virus" exclusions to be placed in some policies, but not others, the insurance

industry drafting arm, ISO, circulated a submission, ISO Circular LI-CF-2006-175, to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. … Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

45. The presence of virus or disease has resulted in physical damage to property in that manner in this case, including structural alteration of the ambient air and the surfaces of the property, along with a loss of functionality and the diminishment of functional space.

46. State Auto also agreed to pay Extra Expense incurred during the "period of restoration" that the insureds would not have incurred if no direct physical loss or damage to property at the described premises." Extra Expense includes costs incurred to avoid or minimize the suspension of business and to continue "operations."

47. State Auto also agreed to pay for the loss of business income sustained and necessary Extra Expense caused by action of civil authority which prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of loss.

48. State Auto also agreed to cover losses incurred in the event of loss or damage to Covered Property and the insured takes "all reasonable steps to protect the Covered Property from further damage." By its express terms, this "Sue and Labor" coverage is not limited to actual direct physical loss or damage to property but instead, applies to imminent loss or damage.

49. State Auto also agreed to cover Coventry Deli's Contagious or Infectious Disease losses where its operations were suspended at the described premises due to an order of a civil authority resulting from the actual or alleged exposure at the described premises to a contagious or infectious disease.

50. Losses caused by COVID-19 and the related orders issued by local, state, and federal authorities triggered the Business Income, Extra Expense, Civil Authority, Sue and Labor and Contagious and Infectious Disease Coverage provisions of the State Auto policies.

**B. The Risk Insured Against In the All Risk Policies**

**1. The COVID-19 Pandemic**

51. The coronavirus and coronavirus-containing respiratory droplets and nuclei are physical substances that are active on physical surfaces and are also emitted into the air. Such substances are not theoretical, intangible, or incorporeal, but rather have a material existence and are physically dangerous. Fomites, droplets, droplet nuclei, and aerosols containing the coronavirus are dangerous physical substances that have a tangible existence.

52. Severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) is a betacoronavirus that is genetically related to several other zoonotic coronaviruses, including SARS-CoV-1, the etiological agent of SARS. SARS-CoV-2 causes coronavirus disease (COVID-19) in humans. SARS-CoV-2 has glycoprotein "spikes" that are able to bind to human angiotensin converting enzyme 2 (ACE-2) receptors, which is present on human respiratory epithelial cells. After binding to ACE-2, the virus is able to enter the cells and make copies of itself, which are then released. These released infectious viral particles are then expelled in respiratory secretions as respiratory droplets into a multiphase, turbulent gas cloud during breathing, coughing, sneezing, talking, and singing. There are large and small respiratory

droplets within the cloud. Large respiratory droplets can infect other people either directly, through direct contact with respiratory mucosal surfaces, or indirectly, by contaminating surfaces which are then touched by another person who subsequently touches her or his mouth, nose, or eyes.  The small droplets remain in the air as an aerosol, which can remain suspended in the air for hours, travel prolonged distances indoors along air currents induced by the heating and ventilation ("HVAC") system, and travel from room to room, infecting people directly through contact with, and inhalation of, the aerosol. Particles from the aerosol can also contaminate surfaces.

53.     According to the World Health Organization ("WHO"), the incubation period for COVID-19—*i.e.*, the time between exposure to the coronavirus and symptom onset—can be up to 14 days. Other studies suggest that the period may be up to 21 days. Before infected individuals exhibit symptoms, *i.e.*, the so-called "pre-symptomatic" period, they are most contagious, as their viral loads will likely be very high, and they may not know they have become carriers.  Pre- and asymptomatic carriers are likely unaware that they are spreading the coronavirus by merely touching objects and surfaces, or by expelling droplets into the air. The National Academy of Sciences has found that the majority of transmission is attributable to people who are not showing symptoms, either because they are pre-symptomatic or asymptomatic.

54.     The virus cannot be observed by the human eye without enhancement. No one can see the virus in the air, on one's hands, or on a surface.  This, of course, makes it difficult to eliminate the virus, or eradicate its transmission, from air or surfaces.  The presence of the virus is only observed through the infection rate in a particular area.

55. The presence of the virus in a community, evidenced by infection rates, makes it more probably true than not, that live virus has been transferred in the air and to objects and surfaces. SARS-Co-V-2 spread is logarithmic.

56. Aerosol, droplet, and fomite transmission are the basis for social distancing, hand-washing, stay-at-home orders, home-shelter orders, distance learning, reduced capacity and/or occupancy limits, and other measures implemented in various executive orders, including the Closure Orders from the States of Pennsylvania and Wisconsin. The virus is physically present in the community, including in the air and on objects and surfaces. Aerosol and fomite transmission are real, and due to constant recontamination of air and surface areas, it is simply impossible to entirely eradicate the virus from indoor spaces and such surfaces if there continue to be unmasked people in the area.

57. COVID-19 causes physical loss and damage by, among other things, destroying, distorting, corrupting, attaching to, and physically altering property, including its surfaces, and by rendering property unusable, uninhabitable, unfit for intended function, dangerous and unsafe. COVID-19 has caused such physical loss and damage to Plaintiffs' properties, as described further below.

58. *First*, respiratory droplets (*i.e.*, droplets larger than 5-10 μm) expelled from infected individuals land on, attach, and adhere to surfaces and objects. In doing so, they structurally change the property and its surface by becoming a part of that surface. This structural alteration makes physical contact with those previously safe, inert surfaces (*e.g.*, fixtures, handrails, furniture) unsafe.

59. According to the WHO, people can become infected with the coronavirus by touching such objects and surfaces, then touching their eyes, nose, or mouth. This mode of

transmission—indirect transmission via objects and surfaces—is known as "fomite transmission." As the WHO has noted, fomite transmission is "a likely mode of transmission for SARS-CoV-2" because studies have consistently confirmed the existence of virus-laden droplets on objects and surfaces "in the vicinity of infected cases," and because it is well known that other coronaviruses can be transmitted via fomite transmission.[7]

60.      A study of a COVID-19 outbreak published in the CDC's Emerging Infectious Diseases journal identified indirect transmission via objects such as elevator buttons and restroom taps as an important possible cause of a "rapid spread" of the coronavirus in a shopping mall in Wenzhou, China.[8]

61.      Research has indicated that the coronavirus can be detected on certain surfaces even weeks after infected persons are present at a given location.

62.      In a study by the U.S. National Institutes of Health, researchers found that the coronavirus was detectable for up to three hours in aerosols, four hours on copper, up to 24 hours on cardboard, and up to three days on stainless steel and plastic surfaces.[9]

63.      Another study found that the coronavirus remains active and dangerous on plastics for at least three days, while another reported that the coronavirus remained stable and viable for seven days on a range of common surfaces, including stainless steel, plastic, glass, and wood.[10]  Another study even detected viable coronavirus samples on stainless steel and glass for

---

[7] *See* https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions

[8] *See* https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article

[9] *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hourssurfaces

[10] *See* https://www.nejm.org/doi/full/10.1056/nejmc2004973;
https://www.medrxiv.org/content/10.1101/2020.05.07.20094805v1.full.pdf;
https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7

approximately one month if left at or around room temperature. All of these materials are used by Plaintiffs.

64. When the coronavirus and COVID-19 attach to and adhere on surfaces and materials, they become a part of those surfaces and materials, converting the surfaces and materials to fomites.[11] This represents a physical change in the affected surface or material, which constitutes physical loss and damage.

65. Merely cleaning surfaces may reduce but does not altogether eliminate the risk of transmission amongst people. There may be surfaces with residual infectious virus, and aerosolized infectious particles. In other words, disinfection is temporary at best; however, a space may remain infested if an aerosol is present, and immediately become contaminated thereafter if another infected person is present in the area. This infestation will provide a constant modality for infection to people.

66. *Second*, when individuals carrying the coronavirus breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei (*i.e.*, those smaller than 5 μm) that remain in the air and, like dangerous fumes, make the premises unsafe and affirmatively dangerous. This process alters the structural properties of air in buildings from safe and breathable to unsafe and dangerous.

67. Aerosol transmission is believed to be a common mode of transmission in many settings. Aerosols can be generated through simple breathing, as well as heavier breathing while, for example, exercising at a health club. According to research published in The Journal of the American Medical Association, a person who sneezes can release a cloud of pathogen-bearing

---

[11] *See* https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions

droplets that can span as far as 23 to 27 feet.[12]  If a person is infected with SARS-CoV-2, whether symptomatic or asymptomatic, infectious viral particles will be aerosolized into the air through their breathing. Infection clusters suggest that aerosol, droplet, and fomite transmission explain SARS-CoV-2 transmission amongst humans.

68.    Airborne viral particles are known to have spread into a building's HVAC system, leading to transmission of the coronavirus from person to person.  One study found the presence of the coronavirus within the HVAC system servicing hospital ward rooms of COVID-19 patients.  This study detected SARS-CoV-2 RNA in ceiling vent openings, vent exhaust filters, and central ducts that were located more than 50 meters from the patients' rooms.[13]

69.    The Environmental Protection Agency ("EPA") has compiled several studies reflecting "epidemiological evidence suggestive of [coronavirus] transmission through aerosol."[14]   Based on these and other studies, the EPA has recommended that buildings make improvements to their HVAC systems by, for example, increasing ventilation with outdoor air and air filtration.[15]

70.    The presence of COVID-19 at a property causes physical loss and damage by necessitating remedial measures to reduce or eliminate the presence of cases of COVID-19 and the coronavirus on-site.

71.    The presence of the virus, whether circulating or stagnant, has changed the object, surface, or premises, in that it has become dangerous to handle and/or enter, and cannot be used

---

[12] *See* https://jamanetwork.com/journals/jama/fullarticle/2763852.

[13] *See* https://www.researchsquare.com/article/rs-34643/v1

[14] *See* https://www.epa.gov/coronavirus/indoor-air-and-covid-19-key-references-andpublications

[15] *See* https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19

without remedial measures.  Its use can only be restored with remedial action and sufficient time for the contaminated air to be evacuated, as suggested by infectious disease experts.

72.    The presence of cases of COVID-19 at a property causes physical loss and damage by rendering a property that is usable and safe for humans into a property that, absent remedial measures, is unsatisfactory for use, uninhabitable, unfit for its intended function, and extremely dangerous and potentially deadly for humans.

73.    In addition, the presence of COVID-19 on property creates the imminent threat of further damage to that property or to nearby property.  Individuals who come into contact, for example, with respiratory droplets at one location in the building by touching a fixture, pressing an elevator button, or gripping a handrail, will carry those droplets on their hands and deposit them elsewhere in the building, causing additional damage and loss.

74.    The presence of COVID-19 has caused civil authorities throughout the country to issue orders requiring the whole or partial interruption of business at a wide range of establishments, including civil authorities with jurisdiction over the Covered Locations.  These Closure Orders have directly impacted Plaintiffs' businesses.

75.    Many governmental bodies specifically found that COVID-19 causes property damage when issuing stay at home orders. *See* N.Y.C. Emergency Exec. Order No. 100, at 2 (Mar. 16, 2020)[16] (emphasizing the virulence of COVID-19 and that it "physically is causing property loss and damage"); N.Y.C. Emergency Exec. Order No. 103 at 1 (March 25, 2020)[17] (recognizing that actions taken to prevent spread of COVID-19 "have led to property loss and damage"); Broward Cty. Fla. Administrator's Emergency Order No. 20-01, at 2 (Mar. 22,

---

[16] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf

[17] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-103.pdf

2020)[18] (noting that COVID-19 "constitutes a clear and present threat to the lives, health, welfare, and safety of the people of Broward County"); Harris Cty. Tex. Office of Homeland Security & Emergency Mgmt., Order of Cty. J. Lina Hidalgo, at 2 (Mar. 24, 2020)[19] (emphasizing that the COVID-19 virus can cause "property loss or damage" due to its contagious nature and transmission through "person-to-person contact, especially in group settings"); Napa Cty. Cal. Health & Human Service Agency, Order of the Napa Cty. Health Officer (Mar. 18, 2020)[20] (issuing restrictions based on evidence of the spread of COVID-19 within the Bay Area and Napa County "and the physical damage to property caused by the virus"); City of Key West Fla. State of Local Emergency Directive 2020-03, at 2 (Mar. 21, 2020)[21] (COVID-19 is "causing property damage due to its proclivity to attach to surfaces for prolonged periods of time"); City of Oakland Park Fla. Local Public Emergency Action Directive, at 2 (Mar. 19, 2020)[22] (COVID-19 is "physically causing property damage"); Panama City Fla. Resolution No. 20200318.1 (Mar. 18, 2020)[23] (stating that the resolution is necessary because of COVID-19's propensity to spread person to person and because the "virus physically is causing property damage"); Exec. Order of the Hillsborough Cty. Fla. Emergency Policy Group, at 2 (Mar. 27, 2020)[24] (in addition to COVID-19's creation of a "dangerous physical condition," it also creates "property or business income loss and damage in certain circumstances"); Colorado Dept of Pub. Health &

---

[18] https://www.broward.org/CoronaVirus/Documents/BerthaHenryExecutiveOrder20-01.pdf

[19] https://www.taa.org/wp-content/uploads/2020/03/03-24-20-Stay-Home-Work-Safe-Order_Harris-County.pdf

[20] https://www.countyofnapa.org/DocumentCenter/View/16687/3-18-2020-Shelter-at-Home-Order

[21] https://www.cityofkeywest-fl.gov/egov/documents/1584822002_20507.pdf

[22] https://oaklandparkfl.gov/DocumentCenter/View/8408/Local-Public-Emergency-Action-Directive-19-March-2020-PDF

[23] https://www.pcgov.org/AgendaCenter/ViewFile/Item/5711?fileID=16604

[24] https://www.hillsboroughcounty.org/library/hillsborough/mediacenter/documents/administrator/epg/saferathomeorder.pdf

Env't, Updated Public Health Order No. 20-24, at 1 (Mar. 26, 2020)[25] (emphasizing the danger of "property loss, contamination, and damage" due to COVID-19's "propensity to attach to surfaces for prolonged periods of time"); Sixth Supp. to San Francisco Mayoral Proclamation Declaring the Existence of a Local Emergency, 26 (Mar. 27, 2020)[26] ("This order and the previous orders issued during this emergency have all been issued … also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time"); City of Durham NC, Second Amendment to Declaration of State of Emergency, at 8 (effective Mar. 26, 2020)[27] (prohibiting entities that provide food services from allowing food to be eaten at the site where it is provided "due to the virus's propensity to physically impact surfaces and personal property"); and State of Nevada Declaration of Emergency Directive 016 at 1 (Apr. 29, 2020)[28] (noting "ability of the novel coronavirus that causes COVID-19 to survive on surfaces for indeterminate periods of time renders some property unusable and contributes to contamination, damage, and property loss").

### 2. **The Closure Orders**

76.     The spread and presence of COVID-19 has caused civil authorities throughout the country to issue orders requiring the suspension of business at a wide range of establishments, including civil authorities with jurisdiction over Plaintiffs' businesses (the "Closure Orders").

---

[25] https://www.pueblo.us/DocumentCenter/View/26395/Updated-Public-Health-Order---032620

[26] https://sfgov.org/sunshine/sites/default/files/sotf_061020_item3.pdf

[27] https://durhamnc.gov/DocumentCenter/View/30043/City-of-Durham-Mayor-Emergency-Dec-Second-Amdmt-3-25-20_FINAL

[28]https://gov.nv.gov/News/Emergency_Orders/2020/2020-04-29_-_COVID-19_Declaration_of_Emergency_Directive_016_(Attachments)/

### a. __The Closure Orders in Pennsylvania__

77.     On March 6, 2020, the Commonwealth of Pennsylvania Governor Tom Wolf issued a proclamation of disaster emergency for the entire Commonwealth of Pennsylvania.

78.     On March 19, 2020, Governor Wolf issued a civil authority order requiring the closure of all but "life-sustaining" businesses, which thereby closed Coventry Deli, Joseph Anthony Hair Studio, and Van Joe.

79.     On March 15, 2020, Governor Wolf issued a civil authority order directing all restaurants and bars to close their dine-in facilities and service while allowing them to provide carry-out, drive-through and/or delivery services.

80.     On March 23, Governor Wolf issued the first Pennsylvania "Stay at Home" Order which was later extended statewide through June 4, 2020.

81.     Governor Wolf issued a civil authority order that moved Delaware County, where Joseph Anthony's Glen Mills location and Van Joe are based, into Pennsylvania's "Yellow Phase" of reopening and relaxing certain restrictions like the stay at home order and the ban on non-life sustaining travel as of June 5, 2020.  Thereunder, salons remained closed.  Restaurants were permitted to reopen outdoors, but not indoors, and gatherings of more than 25 persons were prohibited.

82.     At the same time, the Mayor of the City of Philadelphia, James F. Kenney, entered an order on May 29, 2020 indicating that as of June 5, 2020, the City would move to the "Yellow Phase" of the process of reopening with additional, Philadelphia-specific restrictions in place established by the Governor.  Thereunder, on-site dining at restaurants and cafés remained prohibited.  Prohibitions on gatherings of more than twenty-five (25) people remained in effect.

83.     Per a subsequent civil authority order issued by Pennsylvania's Governor Wolf and Secretary of Health Rachel Levine, Delaware County, Pennsylvania was moved to the Green Phase of reopening as of June 26, 2020.  Under this order, hair salons and barbershops were permitted to re-open at 50% capacity and by appointment only.

84.     Thereafter, on September 21, 2020, Governor Wolf issued an Executive Order amending his prior "Directing Targeting Mitigating Measures" Order of July 15, 2020 allowing for 50% indoor capacity dining, but requiring the sale or dispensing of alcohol to cease at 11:00 PM.  Secretary of Health Rachel Levine issued a similar order on September 17, 2020.

85.     Per a subsequent civil authority order entered on July 3, 2020, Philadelphia moved to a green phase of reopening on June 5, 2020.  However, indoor dining remained prohibited.

86.     It was not until September 8, 2020, that indoor dining was temporarily permitted in Philadelphia.  Indoor dining capacity was subsequently temporarily increased to 50% as of October 2, 2020.

87.     However, a subsequent order issued on November 16, 2020, closed indoor dining operations in Philadelphia once more as of November 20, 2020 through January 1, 2021.  Outdoor dining was restricted to four seats per table for guests all of whom were required to be from the same household.

88.     Indoor dining in Philadelphia re-opened at 25% capacity on January 16, 2021, and expanded to 50% if the establishment passed an air ventilation test as of February 12, 2020.

89.     As of April 4, 2021, restaurants in Pennsylvania were permitted to operate at 50% capacity and retail businesses, gyms and fitness centers, and personal care services could operate at up to 75% capacity with distancing guidelines in place.  However, Philadelphia did not adopt

these new restrictions and it remained that the indoor dining capacity for restaurants meeting ventilation standards was 50%. Events and gatherings were limited to 35% capacity indoors and 50% capacity outdoors.

**b.  The Closure Orders in Wisconsin**

90.    On March 12, 2020, Wisconsin Governor Tony Evers issued a proclamation declaring a health emergency in response to the COVID-19 Coronavirus.

91.    On March 16, 2020, Governor Evers issued an Executive Order prohibiting mass gatherings of fifty people or more.

92.    On March 17, 2020, Governor Evers issued an Executive Order prohibiting mass gatherings of ten people or more. This Executive Order specifically mandated that "Indoor shopping malls shall close." Because Steck Eye Care is located within Mayfair Mall, Steck Eye Care was required to shut down its operations. This Executive Order was extended on March 20, 2020 by a subsequent Executive Order.

93.    On March 24, 2020, Governor Evers issued Wisconsin's first "Safer at Home Order" which was subsequently extended on April 16, 2020 to remain in effect until May 26, 2020.

94.    Steck Eye Care was fully closed for approximately two weeks before being permitted to open in a limited capacity.  The Mayfair Mall remained mainly closed until May 20, 2020.

95.    On July 30, 2020, September 22, 2020, January 19, 2021, and February 4, 2021 Governor Evers issued additional proclamations declaring a public health emergency relating to COVID-19.

### 3. **The Impact of COVID-19 and the Closure Orders**

96. Plaintiffs have suffered direct physical loss or damage for the reasons stated above, and as follows.

97. COVID-19 was present in the immediate area of the insured premises. Coventry Deli is located approximately 1.3 miles from the Hospital of the University of Pennsylvania, approximately 1.9 miles from Penn Presbyterian Medical Center, 1.5 miles from Jefferson University Hospital, and 1.6 miles from Pennsylvania Hospital.

98. Joseph Anthony's various locations are also in close proximity to hospitals as well. In fact, its 12th and Market Street insured location is within a 2-mile radius of the above-referenced hospitals.

99. Steck Eye Care is located approximately 2.8 miles from Children's Wisconsin – Milwaukee Hospital and Froedtert Hospital, the primary teaching affiliate of the Medical College of Wisconsin.

100. On information and belief, COVID-19 has been present at these hospitals, and has caused physical loss and damage at these hospitals since at least March 2020. The Pennsylvania and Wisconsin Closure Orders were issued, at least in part, in response to dangerous physical conditions and damage at these hospitals, and to prevent further damage at these hospitals.

101. Individuals with COVID-19 or otherwise carrying the coronavirus have been physically present at Plaintiffs' premises. Coronavirus-containing fomites (*i.e.*, inanimate objects), respiratory droplets, and nuclei from those individuals come into contact with, adhere to, and attach to the surfaces of the property upon which they land, including without limitation, the real property, furniture, fixtures, and personal property at the premises.

102.    The coronavirus is ubiquitous—it has spread throughout all fifty states. Some individuals carry it with no symptoms; it cannot be visibly detected on surfaces and can remain on surfaces for weeks. The prolonged presence of COVID-19 in the areas encompassing Plaintiffs' insured properties made it unavoidable that individuals with COVID-19 or otherwise carrying the coronavirus, including guests, employees, contractors, patients, and business visitors, would be physically present at the insured premises on various dates since the earliest days of the pandemic.  Plaintiffs' guests and patrons have reported COVID-19 positive test results and their employees have had to quarantine due to direct exposure.

103.    Coronavirus or coronavirus-containing fomites, respiratory droplets, and nuclei physically alter property to which they adhere, attach, or come in contact including without limitation by altering the surfaces of that property and/or by making physical contact with those previously safe, inert materials dangerous.

104.    When individuals carrying the coronavirus breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei that remain in the air and, like dangerous fumes, make the premises unsafe and affirmatively dangerous. In addition, the coronavirus physically alters the air. Air inside buildings that was previously safe to breathe, but can no longer safely be breathed due to coronavirus and COVID-19, has undergone a physical alteration.

105.    Persons who tested positive for COVID-19 were present at insured property on various dates during 2020 and 2021.  Persons who came into contact with persons diagnosed with COVID-19 were present at insured property on various dates during 2020 and 2021.

106.    Coronavirus droplets have been conveyed from infected persons (whether symptomatic, pre-symptomatic, or asymptomatic) to solid surfaces, including but not limited to furniture, doors, floors, bathroom facilities, equipment, and supplies, and into the air and HVAC

26

system at the insured properties, causing damage and alteration to physical property and ambient air at the premises. Aerosolized coronavirus has entered the air in Plaintiffs' properties.

107.   The presence of the coronavirus and COVID-19, including but not limited to coronavirus droplets or nuclei on solid surfaces and in the air at insured property, has caused and will continue to cause direct physical damage to physical property and ambient air at the premises. Coronavirus, a physical substance, has attached and adhered to Plaintiff's properties, and by doing so, altered that property. Such presence has also directly resulted in loss of functionality of that property.

108.   The physical losses to Plaintiffs' properties include without limitation the rendering of its insured property from a satisfactory state to a state dangerous and/or unsatisfactory for use because of the fortuitous presence and effect of the coronavirus, fomites, and respiratory droplets or nuclei directly upon the property.

109.   The physical losses to Plaintiffs' properties include without limitation the physical loss of the ability to use covered properties for their primary function.

110.   The presence of COVID-19, including but not limited to coronavirus droplets or nuclei on solid surfaces and in the air at insured property, caused "direct physical loss of or physical damage to" covered property under Plaintiffs' policies, and the policies of the other Class members, by: (i) causing direct physical loss of or damage to the covered property; (ii) denying use of and damaging the covered property; (iii) requiring physical repair and/or alterations to the covered property; and/or (iv) by causing a necessary suspension of operations during a period of restoration.

111.   In addition, the functional space at the insured properties has been diminished by the spread or presence of COVID-19. For example: Joseph Anthony lost its functionality as a

space for skin care services, permanent makeup, and certain types of waxing; the space could not be used for two months; and the space can now operate only at 50% capacity.

112.    Steck Eye Care is located in Mayfair Mall which is home to 164 stores including seven anchor stores.

113.    As noted above, Coventry Deli is located within a large commercial office building in the heart of Philadelphia's business district.

114.    There were multiple tenants and employees of other businesses located within the building that Coventry Deli is located whom tested positive for COVID-19 when the deli was open.  The building manager circulated e-mails to all other tenants confirming the presence of positive cases within the building and suggesting a work-from-home policy for all tenants and their employees.

115.    Likewise, employees of Joseph Anthony Hair Studio and Van Joe, including hair stylists, salon assistants, and spa assistants, have tested positive for COVID-19.

116.    Two employees of Steck Eye Care are also known to have tested positive for COVID-19.

117.    To repair the physical loss or damage, including the harm to the air inside Covered Property and the infestation on the surface of Covered Property caused by COVID-19 as well as its continued imminent threat of further infestation of the insured properties, a deep cleaning process has been implemented as required by the local health departments at the insured premises.

118.    These intensified cleaning measures which were performed using professional-grade products constitute a necessary repair or change to the insured properties without which the insureds would not have been able to continue their businesses.

28

119.    The fact that COVID-19 has caused "direct physical loss of or damage to" Plaintiffs' premises is further evidenced by the numerous recent alterations made to the premises and Plaintiffs' business operations in attempt to repair the physical loss or damage to property.

120.    By way of example, Coventry Deli has installed plexiglass shields at and around the registers at Coventry Deli.

121.    The deli's condiments station, which was previously available for public use, has been relocated for use by employees of the deli, and 22 tables which were previously available for dining have been removed altogether.

122.    Similarly, plexiglass has been installed at the front desk, between shampoo stations, at nail stations and at the café bar of Joseph Anthony Hair Studio and Van Joe.

123.    Although the stations themselves are non-moveable, less than half of the stations are being utilized and only every other room is open for business in the spa areas.  Hands-free sanitizing locations and UV lighting has been installed at both the Van Joe and Joseph Anthony Glen Mills, Pennsylvania locations.  Surfaces in the salons are also being destroyed by constant cleaning.

124.    Likewise, plexiglass was installed at Steck Eye Care in the main lobby.  Steck Eye Care also installed UVC lights in the contacts room, an ozone generator, and air filters in the exam room. Steck Eye Care also incurred Extra Expense costs for new refraction equipment to increase the distance between optometrist and patient.

125.    At the same time, each of the insureds have expended sizeable sums and significant costs on an increased volume of professional grade cleaning supplies that they would not have purchased had COVID-19 not infested the premises and continued to imminently threaten to do so.

126.    Plaintiffs purchased face masks, and disposable gloves (which have nearly doubled in price during the pandemic) for usage by employees.  While disposable gloves were previously purchased, they are now purchased with increased frequency due to the presence of and/or imminent threat of COVID-19.

127.    While dealing with a heightened need for cleaning instituted at a significantly increased frequency, Plaintiffs have at the same time been forced to reduce their workforces and deal with last minute notice from employees that the employees are unable to come to work due to the sudden illness brought about by the virus and/or the known exposure to it.

128.    Additionally, new signage and markings are now in place throughout the insured premises to promote social distancing and offer safety guidelines for members.

129.    Thus, because the spread and presence of COVID-19 altered the structure of the air, the physical space, and property surfaces, there have been many even more obvious structural alterations, changes and/or repairs made the insured premises so that Plaintiffs can continue their business after experiencing direct property damage which was caused by COVID-19 and to avoid imminent threat of further property damage.

130.    The Closure Orders prohibited access to Plaintiffs' and the other Class members' Covered Property, and the area immediately surrounding Covered Property, in response to dangerous physical conditions resulting from a Covered Cause of Loss.

131.    Property nearby Plaintiffs' properties suffered direct physical loss of or damage as described above, and in the same manner that Plaintiffs suffered such loss or damage as described above.

132.    For instance, due to COVID-19 and the Closure Orders, The Academy of Natural Sciences of Drexel University, located 0.4 miles from Coventry Deli closed in March 2020.  It

reopened in July 2020 and re-closed in November 2020 until January 2021. Museum capacity is currently limited to 25% or less with social distancing in place. To ensure the safety of visitors, three of the museum's exhibits remain closed. Likewise, Philadelphia's other Parkway museums including the Philadelphia Museum of Art, the Barnes Foundation and the Franklin Institute closed from March 14, 2021 for nearly six months and, after reopening closed once more for a six week period from mid-November through January 1, 2021. Reduced capacity and other enhanced safety measures are in place.

133.     Due to COVID-19 and the Closure Orders, the Newlin Grist Mill Park located 1.0 mile from Joseph Anthony Glen Mills was closed from March 2020 through the remainder of the year. Its buildings remain closed.

134.     Due to COVID-19 and the Closure Orders, the Reading Terminal Market, located 0.1 miles from Joseph Anthony Philadelphia, was closed for dine-in services from March 2020 to January 16, 2021. Although dine-in services are now offered at a revised schedule with a limited number of vendors, indoor dining is limited to 25% capacity on a first come first serve basis at select merchant counters.

135.     Due to COVID-19 and the Closure Orders, The National Constitution Center, which is located 0.7 miles from Joseph Anthony Philadelphia, was closed for live visits from March 2020 through August 5, 2020 and then again from November 2020 through February 12, 2021. It is now open at a modified schedule with safety measures in place. The Liberty Bell Center and Independence Hall were closed from March 2020 to mid-September 2020. Although presently open, both are operating at greatly reduced capacity and under modified schedules.

136.     Due to COVID-19 and the Closure Orders, Tavola Restaurant, located 0.1 miles from Van Joe, was closed for dine-in services March 2020 to June 2020. The nearby Springfield

31

mall, located 1.0 mile from Van Joe, was closed from March 2020 through the end of June 2020 as well with a limited number of stores reopening and reduced hours, capacity and strict safety guidelines in place.

137.    Due to COVID-19 and the Closure Orders, the Milwaukee County Zoo, located 3.1 miles from Steck Eye Care was closed beginning in March 2020 and reopened only partially in June 2020, with distancing and masking requirements in place.  Likewise, the Pettit National Ice Center, located 3.9 miles from Steck Eye Care was closed from March 2020 to June 2020.  It is now open only to contract hockey and figure skating users, and is closed for public skating until further notice.

138.    Plaintiffs' properties have not been functional for their business purposes because of the changed physical environment due to COVID-19.

139.    COVID-19 has also presented an imminent threat of immediate damage or loss to Plaintiffs' properties, forcing Plaintiffs to take costly action to prevent further damage or loss.

140.    The Closure Orders and other similar closure orders around the country have prohibited access to Plaintiffs' facilities and properties and the areas immediately surrounding said facilities and properties, in response to dangerous physical conditions resulting from a Covered Cause of Loss.

141.    As a result of the presence of COVID-19 and the Closure Orders, Plaintiffs and the other Class members lost Business Income and incurred Extra Expenses.

142.    Plaintiffs submitted claims for loss to State Auto under their policies due to the presence of COVID-19 and the Closure Orders, but State Auto denied their claims.

143.    Losses caused by COVID-19 and the related Closure Orders issued by civil authorities triggered the Business Income, Extra Expense, Civil Authority, Sue and Labor and Contagious or Infectious Disease coverage provisions of the State Auto Policies.

144.    Despite this, Defendant State Auto has refused to pay any such claims for coverage under the Policies, and indeed has denied Plaintiffs' claims under the Policies.

### 4.   The Insurance Industry's Virus Exclusion is Not in the State Auto Policies

145.    Many insurance policies issued in the United States that cover business interruption (though not the Policies at issue) contain an exclusion identical or very similar to the Insurance Services Office ("ISO") Form CP 01 40 07 06, adopted in 2006 and titled "Amendatory Endorsement – Exclusion of Loss Due to Virus or Bacteria."

146.    The ISO Form CP 01 40 07 06 exclusion and those similar to it typically state: "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

147.    By virtue of ISO Form CP 01 40 07 06, State Auto unquestionably knew exactly how to exclude coverage for loss caused by or resulting from any virus, *yet State Auto chose not to do so*. Indeed, *the Policies contain no such virus exclusion*; the word "virus" does not appear anywhere in the Policies outside the context of a computer virus.

148.    The Policies in no way exclude or limit coverage for losses caused by viruses, such as COVID-19.

### V.    CLASS ACTION ALLEGATIONS

149.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

150.    Plaintiffs seek to represent nationwide Classes defined as:

- All persons and entities that: (a) had business income coverage under a Businessowners Special Property Coverage Form issued by State Auto; (b) suffered a suspension of business related to COVID-19, at the premises covered by their State Auto business policy; (c) made a claim under their business insurance policy issued by State Auto; and (d) were denied business income coverage by State Auto for the suspension of business resulting from the presence or threat of COVID-19 (the "Business Income Breach Class").

- All persons and entities that: (a) had Civil Authority coverage under a Businessowners Special Property Coverage Form issued by State Auto;(b) suffered loss of income and/or extra expense caused by action of a civil authority; (c) made a claim under their business insurance policy issued by State Auto; and (d) were denied Civil Authority coverage by State Auto for the loss of Business Income and/or expense caused by a Closure Order (the "Civil Authority Breach Class").

- All persons and entities that: (a) had Extra Expense coverage under a Businessowners Special Property Coverage Form issued by State Auto; (b) sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their State Auto property insurance policy; (c) made a claim under their business insurance policy issued by State Auto; and (d) were denied Extra Expense coverage by State Auto despite their efforts to minimize the suspension of business caused by COVID-19 (the "Extra Expense Breach Class").

- All persons and entities that: (a) had a Sue and Labor coverage under a Businessowners Special Property Coverage Form issued by State Auto; (b) sought to prevent property damage caused by COVID-19 by suspending or reducing business operations, at the premises covered by their State Auto business insurance policy; (c) made a claim under their property insurance policy issued by State Auto; and (d) were denied Sue and Labor coverage by State Auto in connection with the suspension of business caused by COVID-19 (the "Sue and Labor Breach Class").

- All persons and entities that: (a) had Contagious or Infectious Disease Coverage under the endorsement entitled "Business Income and Extra Expense – Limited Extension for Food-Borne Illness" issued by State Auto; (b) whose operations at the insured premises were suspended due to the order of a civil authority or adverse public communications or media reports, resulting from the actual or alleged exposure of the described premises to COVID-19 and/or the Coronavirus; (c) made a claim under their

34

property insurance policy issued by State Auto; and (d) were denied Contagious or Infectious Disease Coverage in connection with the suspension of business caused by COVID-19 and/or the Coronavirus ("the Contagious or Infectious Disease Coverage Class").

- All persons and entities with Business Income coverage under a Businessowners Special Property Coverage Form issued by State Auto that suffered a suspension of business due to COVID-19 at the premises covered by the business income coverage (the "Income Protection Declaratory Judgment Class").

- All persons and entities with Civil Authority coverage under a Businessowners Special Property Coverage Form issued by State Auto that suffered loss of income and/or extra expense caused by a Closure Order (the "Civil Authority Declaratory Judgment Class").

- All persons and entities with Extra Expense coverage under a Businessowners Special Property Coverage Form issued by State Auto that sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their State Auto property insurance policy (the "Extra Expense Declaratory Judgment Class").

- All persons and entities with Sue and Labor coverage under a Businessowners Special Property Coverage Form issued by State Auto that sought to prevent property damage caused by COVID-19 by suspending or reducing business operations, at the premises covered by their State Auto property insurance policy (the "Sue and Labor Declaratory Judgment Class").

- All persons and entities with a Contagious or Infectious Disease Coverage provision under the Endorsement entitled "Business Income and Extra Expense – Limited Extension for Food-Borne Illness" issued by State Auto whose operations at the insured premises were suspended due to the order of a civil authority or adverse public communications or media reports, resulting from the actual or alleged exposure of the described premises to COVID-19 and/or the Coronavirus ("the Contagious or Infectious Disease Coverage Class").

- Each of the foregoing classes also includes all persons and entities with covered losses that suffered a repudiation by State Auto or its agents, and thus did not make a claim under their respective policies.

35

151.    Excluded from each defined Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend each of the Class definitions, as appropriate, during the course of this litigation.

152.    This action has been brought and may properly be maintained on behalf of each Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

153.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of each defined Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are thousands of members of each Class, the precise number of Class members is unknown to Plaintiffs but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

154.    **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

      a.    whether State Auto issued all-risk policies to the members of the Class in exchange for payment of premiums by the Class members;

      b.    whether the Class suffered a covered loss based on the common policies issued to members of the Class;

      c.    whether State Auto wrongfully denied all claims arising from COVID-19;

      d.    whether State Auto's Business Income coverage applies to a suspension of business caused by COVID-19;

e. whether State Auto's Civil Authority coverage applies to a loss of income caused by the orders of state governors or other officials requiring the suspension of business as a result of COVID-19;

f. whether State Auto's Extra Expense coverage applies to efforts to minimize a loss caused by COVID-19;

g. whether State Auto's Sue and Labor provision applies to require State Auto to pay for efforts to reduce damage caused by COVID-19;

h. whether State Auto's Contagious or Infectious Disease coverage provision applies where there was a suspension of operations due to a civil authority from the actual or alleged: Exposure of the insured premises to COVID-19;

i. whether State Auto has breached its contracts of insurance through a blanket denial of all claims based on business interruption, income loss or closures related to COVID-19 and the related closures; and

j. whether Plaintiffs and the Class are entitled to an award of reasonable attorney fees, interest and costs.

155. **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Class members are all similarly affected by Defendant's refusal to pay under its Business Income, Civil Authority, Extra Expense, Sue and Labor and Contagious or Infectious Disease coverages. Plaintiffs' claims are based upon the same legal theories as those of the other Class members. Plaintiffs and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendant engaged.

156. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members who they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing

to pay the amounts owed under their policies, and Plaintiffs intend to prosecute this action vigorously. The interests of the above-defined Classes will be fairly and adequately protected by Plaintiffs and their counsel.

157. **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests—Federal Rule of Civil Procedure 23(b)(1).** Plaintiffs seek class-wide adjudication as to the interpretation, and resultant scope, of Defendant's Business Income, Civil Authority, Extra Expense, Sue and Labor and Contagious or Infectious Disease coverages. The prosecution of separate actions by individual members of the Classes would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendant. Moreover, the adjudications sought by Plaintiffs could, as a practical matter, substantially impair or impede the ability of other Class members, who are not parties to this action, to protect their interests.

158. **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendant acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members.

159. **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT – BUSINESS INCOME COVERAGE

**(Claim Brought on Behalf of All Plaintiffs and the Business Income Breach Class)**

160.    Plaintiffs repeat and reallege Paragraphs 1-159 as if fully set forth at length herein.

161.    Plaintiffs bring this Count individually and on behalf of the other members of the Business Income Breach Class.

162.    Plaintiffs' State Auto Policies, as well as those of the other Business Income Breach Class members, are contracts under which State Auto was paid premiums in exchange for its promise to pay Plaintiffs and the other Business Income Breach Class members' losses for claims covered by the Policies.

163.    In the Businessowners Special Property Coverage Form, State Auto agreed to pay for its insureds' loss of income sustained due to partial or total interruption of business resulting directly from loss or damage to property on the insured premises.

164.    COVID-19 caused direct physical loss or damage to Plaintiffs' and the other Business Income Breach Class members' Covered Properties, requiring the suspension of operations at the Covered Properties.  Losses caused by COVID-19 thus triggered the Business Income provision of Plaintiffs' and the other Business Income Breach Class members' State Auto policies.

165.    Plaintiffs and the other Business Income Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by State Auto or State Auto is estopped from asserting them, and yet State Auto has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

166.    By denying coverage for any Business Income losses incurred by Plaintiffs and the other Business Income Breach Class members in connection with the COVID-19 pandemic, State Auto has breached its coverage obligations under the policies.

167.     As a result of State Auto's breaches of the policies, Plaintiffs and the other Business Income Class members have sustained substantial damages for which State Auto is liable, in an amount to be established at trial.

**COUNT II**
**BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE**
**(Claim Brought on Behalf of All Plaintiffs and the Civil Authority Breach Class)**

168.     Plaintiffs repeat and reallege Paragraphs 1-167 as if fully set forth at length herein.

169.     Plaintiffs bring this Count individually and on behalf of the other members of the Civil Authority Breach Class.

170.     Plaintiffs' State Auto business insurance policies, as well as those of the other Civil Authority Breach Class members, are contracts under which State Auto was paid premiums in exchange for its promise to pay Plaintiffs and the other Civil Authority Breach Class members' losses for claims covered by the Policies.

171.     In the Businessowners Special Property Coverage Form, State Auto agreed pay for loss of income sustained, and extra expense incurred, as a result of an action of a civil authority that prohibits access to the insured premises, when the civil authority action is taken in response to damage to property other than the insured premises.

172.     The Closure Orders triggered the Civil Authority provision under Plaintiffs' and the other members of the Civil Authority Breach Class's State Auto business insurance policies. COVID-19 directly caused physical loss or risk of physical loss to property other than Covered Property in the same manner described above that it directly caused physical loss to the Covered Property.  The civil authority orders were actions taken in response to the dangerous physical conditions directly resulting from the physical loss or risk of physical loss to such properties. And, the civil authority orders prohibited access the Covered Property.

173.     Plaintiffs and the other members of the Civil Authority Breach Class have complied with all applicable provisions of the policies, and/or those provisions have been waived

40

by State Auto, or State Auto is estopped from asserting them, and yet State Auto has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

174.    By denying coverage for any business losses incurred by Plaintiffs and other members of the Civil Authority Breach Class in connection with the Closure Orders and the COVID-19 pandemic, State Auto has breached its coverage obligations under the policies.

175.    As a result of State Auto's breaches of the policies, Plaintiffs and the other members of the Civil Authority Breach Class have sustained substantial damages for which State Auto is liable, in an amount to be established at trial.

**COUNT III**
**BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of All Plaintiffs and the Extra Expense Breach Class)**

176.    Plaintiffs repeat and reallege Paragraphs 1-175 as if fully set forth at length herein.

177.    Plaintiffs bring this Count individually and on behalf of the other members of the Extra Expense Breach Class.

178.    Plaintiffs' State Auto business insurance policies, as well as those of the other Extra Expense Breach Class members, are contracts under which State Auto was paid premiums in exchange for its promise to pay Plaintiffs and the other Extra Expense Breach Class members' losses for claims covered by the Policies.

179.    In the Businessowners Special Property Coverage Form, State Auto agreed to pay necessary expenses incurred due to partial or total interruption of business resulting directly from loss or damage to property on the insured premises.

180.    Due to COVID-19 and the Closure Orders, Plaintiffs and the other members of the Extra Expense Breach Class incurred extra expense under the Businessowners Special Property Coverage Form.

181.    Plaintiffs and the other members of the Extra Expense Breach Class have complied with all applicable provisions of the policies and/or those provisions have been waived

by State Auto or State Auto is estopped from asserting them, and yet State Auto has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

182.    By denying coverage for any business losses incurred by Plaintiffs and the other members of the Extra Expense Breach Class in connection with the Closure Orders and the COVID-19 pandemic, State Auto has breached its coverage obligations under the policies.

183.    As a result of State Auto's breaches of the policies, Plaintiffs and the other members of the Extra Expense Breach Class have sustained substantial damages for which State Auto is liable, in an amount to be established at trial.

## COUNT IV
## BREACH OF CONTRACT – SUE AND LABOR COVERAGE
### (Claim Brought on Behalf of All Plaintiffs and the Sue and Labor Breach Class)

184.    Plaintiffs repeat and reallege Paragraphs 1-183 as if fully set forth at length herein.

185.    Plaintiffs bring this Count individually and on behalf of the other members of the Sue and Labor Breach Class.

186.    Plaintiffs' State Auto business policies, as well as those of the other Sue and Labor Breach Class members, are contracts under which State Auto was paid premiums in exchange for its promise to pay Plaintiffs and the other Sue and Labor Breach Class members' losses for claims covered by the Policies.

187.    In the Businessowners Special Property Coverage Form, State Auto agreed to give due consideration in settlement of a claim to expenses incurred in taking all reasonable steps to protect Covered Property from further damage.

188.    In complying with the Closure Orders and otherwise suspending or limiting operations, Plaintiffs and other members of the Sue and Labor Breach Class incurred expenses in connection with reasonable steps to protect Covered Property.

189.    Plaintiffs and the other members of the Sue and Labor Breach Class have complied with all applicable provisions of the Policies and/or those provisions have been waived

by State Auto, or State Auto is estopped from asserting them, and yet State Auto has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

190.    By denying coverage for any Sue and Labor expenses incurred by Plaintiffs and the other members of the Sue and Labor Breach Class in connection with the Closure Orders and the COVID-19 pandemic, State Auto has breached its coverage obligations under the policies.

191.    As a result of State Auto's breaches of the policies, Plaintiffs and the other members of the Sue and Labor Breach Class have sustained substantial damages for which State Auto is liable, in an amount to be established at trial.

**COUNT V**
**BREACH OF CONTRACT – CONTAGIOUS OR INFECTIOUS DISEASE COVERAGE**
**(Claim Brought on Behalf of Coventry Deli and the Contagious or Infectious Disease**
**Coverage Class)**

192.    Plaintiffs repeat and reallege Paragraphs 1-191 as if fully set forth herein.

193.    Plaintiffs bring this Count individually and on behalf of the other members of the Contagious or Infectious Disease Coverage Class.

194.    Plaintiffs' State Auto policies, as well as those of the other the Contagious or Infectious Disease Coverage Class members, are contracts under which State Auto was paid premiums in exchange for its promise to pay Plaintiffs and the other Contagious or Infectious Disease Coverage Class members' losses for claims covered by the Policies.

195.    By way of the Endorsement entitled "Business Income and Extra Expense – Limited Extension for Food-Borne Illness," State Auto agreed to provide additional Business Income and Extra Expense Coverage for the following Cause of Loss:

  1.    The suspension of your "operations" at the described premises due to the order of a civil authority; or adverse public communications or media reports, resulting from the actual or alleged:

***

  b.    Exposure of the described premises to a contagious or infectious disease.

43

196.    Plaintiffs and the other Contagious or Infectious Disease Coverage Class members have suspended their operations at the insured premises due to the Closure Orders and/or adverse public communications or media reports resulting from the actual or alleged exposure at the insured locations to COVID-19 and/or the Coronavirus.

197.    Plaintiffs and the other Contagious or Infectious Disease Coverage Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by State Auto, or State Auto is estopped from asserting them, and yet State Auto has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Contagious or Infectious Disease Coverage Class members are entitled.

198.    By denying Contagious or Infectious Disease Coverage to Plaintiffs and the other members of the Contagious or Infectious Disease Coverage Class in connection with the Closure Orders, adverse public communications or media reports and the COVID-19 pandemic, State Auto has breached its coverage obligations under the Policies.

199.    As a result of State Auto's breaches of the policies, Plaintiffs and the other members of the Contagious or Infectious Disease Coverage Class have sustained substantial damages for which State Auto is liable, in an amount to be established at trial.

## COUNT VI
## DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE
**(Claim Brought on Behalf of the All Plaintiffs and Business Income Protection Declaratory Judgment Class)**

200.    Plaintiffs repeat and reallege Paragraphs 1-199 as if fully set forth herein.

201.    Plaintiffs bring this Count individually and on behalf of the other members of the Business Income Declaratory Judgment Class.

202.    Plaintiffs' State Auto policies, as well as those of the other Business Income Declaratory Judgment Class members, are contracts under which State Auto was paid premiums

in exchange for its promise to pay Plaintiffs and the other Business Income Declaratory Judgment Class members' losses for claims covered by the Policies.

203.    Plaintiffs and the other Business Income Declaratory Judgment Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by State Auto, or State Auto is estopped from asserting them, and yet State Auto has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Business Income Declaratory Judgment Class members are entitled.

204.    State Auto has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

205.    An actual case or controversy exists regarding Plaintiffs and the other Income Protection Declaratory Judgment Class members' rights and State Auto's obligations under the policies to reimburse Plaintiffs for the full amount of business income losses incurred by Plaintiffs and the other Business Income Declaratory Judgment Class members in connection with suspension of their businesses stemming from the COVID-19 pandemic.

206.    Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Business Income Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

a.    Plaintiffs and the other Business Income Declaratory Judgment Class members' income losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

b.    State Auto is obligated to pay Plaintiffs and the other Business Income Declaratory Judgment Class members for the full amount of the income losses incurred and to be incurred in connection with the Closure Orders during the period of restoration

and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT VII**
**DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE**
**(Claim Brought on Behalf of All Plaintiffs and the Civil Authority Declaratory Judgment Class)**

207.    Plaintiffs repeat and reallege Paragraphs 1-206 as if fully set forth herein.

208.    Plaintiffs bring this Count individually and on behalf of the other members of the Civil Authority Declaratory Judgment Class.

209.    Plaintiffs' State Auto business insurance policies, as well as those of the other Civil Authority Declaratory Judgment Class members, are contracts under which State Auto was paid premiums in exchange for its promise to pay Plaintiffs and the other Civil Authority Declaratory Judgment Class members' losses for claims covered by the State Auto Policies.

210.    Plaintiffs and the other Civil Authority Declaratory Judgment Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by State Auto, or State Auto is estopped from asserting them, and yet State Auto has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Class members are entitled.

211.    State Auto has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

212.    An actual case or controversy exists regarding Plaintiffs and the other Civil Authority Declaratory Judgment Class members' rights and State Auto's obligations under the policies to reimburse Plaintiffs and the other Civil Authority Declaratory Judgment Class members for the full amount of covered Civil Authority losses incurred by Plaintiffs and the other Civil Authority Declaratory Judgment Class members in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

213.    Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Civil Authority Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

a.    Plaintiffs and the other Civil Authority Declaratory Judgment Class members' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

b.    State Auto is obligated to pay Plaintiffs and the other Civil Authority Declaratory Judgment Class members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT VIII**
**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of All Plaintiffs and the Extra Expense Declaratory Judgment Class)**

214.    Plaintiffs repeat and reallege Paragraphs 1-213 as if fully set forth herein.

215.    Plaintiffs bring this Count individually and on behalf of the other members of the Extra Expense Declaratory Judgment Class.

216.    Plaintiffs' State Auto business insurance policies, as well as those of the other Extra Expense Declaratory Judgment Class members, are contracts under which State Auto was paid premiums in exchange for its promise to pay Plaintiffs and the other Extra Expense Declaratory Judgment Class members' losses for claims covered by the Policies.

217.    Plaintiffs and the other Extra Expense Declaratory Judgment Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by State Auto, or State Auto is estopped from asserting them, and yet State Auto has abrogated its insurance coverage obligations pursuant to the policies clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Class members are entitled.

218.    State Auto has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

219.    An actual case or controversy exists regarding Plaintiffs and the other Extra Expense Declaratory Judgment Class members' rights and State Auto's obligations under the policies to reimburse Plaintiffs and the other Extra Expense Declaratory Judgment Class members for the full amount of Extra Expense losses incurred by Plaintiffs in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

220.    Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Extra Expense Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

    a.    Plaintiffs and the other Extra Expense Declaratory Judgment Class members' Extra Expense losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

    b.    State Auto is obligated to pay Plaintiffs and the other Extra Expense Declaratory Judgment Class members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT IX**
**DECLARATORY JUDGMENT – SUE AND LABOR COVERAGE**
**(Claim Brought on Behalf of All Plaintiffs and the Sue and Labor Declaratory Judgment Class)**

221.    Plaintiffs repeat and reallege Paragraphs 1-220 as if fully set forth herein.

222.    Plaintiffs bring this Count individually and on behalf of the other members of the Sue and Labor Declaratory Judgment Class.

48

223.    Plaintiffs' State Auto insurance policies, as well as those of the other Sue and Labor Declaratory Judgment Class members, are contracts under which State Auto was paid premiums in exchange for its promise to pay Plaintiffs and the other Sue and Labor Declaratory Judgment Class members' reasonably incurred expenses to protect Covered Property.

224.    Plaintiffs and the other Sue and Labor Declaratory Judgment Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by State Auto, or State Auto is estopped from asserting them, and yet State Auto has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and other class members are entitled.

225.    State Auto has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

226.    An actual case or controversy exists regarding Plaintiffs and the other Sue and Labor Declaratory Judgment Class members' rights and State Auto obligations under the policies to reimburse Plaintiff and the other Sue and Labor Declaratory Judgment Class members for the full amount Plaintiffs and the other members of the Sue and Labor Declaratory Judgment Class reasonably incurred to protect Covered Property from further damage by COVID-19.

227.    Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Sue and Labor Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

a. Plaintiffs and the other Sue and Labor Declaratory Judgment Class members reasonably incurred expenses to protect Covered Property from further damage by COVID-19 are insured losses under their policies; and

b. State Auto is obligated to pay Plaintiffs and the other Sue and Labor Declaratory Judgment Class members for the full amount of the expenses they reasonably incurred to protect Covered Property from further damage by COVID-19.

**COUCNT X**
**DECLARATORY JUDGMENT – CONTAGIOUS OR INFECTIOUS DISEASE**
**COVERAGE**
**(Claim Brought on Behalf of Coventry Deli and the Contagious or Infectious Disease**
**Coverage Declaratory Judgment Class)**

228.    Plaintiffs repeat and reallege Paragraphs 1-227 as if fully set forth herein.

229.    Plaintiffs bring this Count individually and on behalf of the other members of the Contagious or Infectious Disease Coverage Declaratory Judgment Class.

230.    Plaintiffs' State Auto insurance policies, as well as those of the other Contagious or Infectious Disease Coverage Declaratory Judgment Class members, are contracts under which State Auto was paid premiums in exchange for its promise to pay Plaintiffs and the other Contagious or Infectious Disease Coverage Declaratory Judgment Class members' Contagious or Infectious Disease Coverage where they have suspended their operations at the insured premises due to civil authority orders and/or adverse public communications or media reports resulting from the actual or alleged exposure at the insured locations to  contagious or infectious diseases such as COVID-19 and/or the Coronavirus.

231.    Plaintiffs and the other Contagious or Infectious Disease Coverage Declaratory Judgment Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by State Auto, or State Auto is estopped from asserting them, and yet State Auto has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Contagious or Infectious Disease Coverage Declaratory Judgment Class members are entitled.

232.    State Auto has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

233.    An actual case or controversy exists regarding Plaintiffs and the other Contagious or Infectious Disease Coverage Declaratory Judgment Class members' rights and State Auto

50

obligations under the policies to provide Plaintiff and the Contagious or Infectious Disease Coverage Declaratory Judgment Class members for the full amount of coverage to which Plaintiffs and the other members of the Contagious or Infectious Disease Coverage Declaratory Judgment Class are entitled.

234.    Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Contagious or Infectious Disease Coverage Declaratory Judgment Class  members seek a declaratory judgment from this Court declaring the following:

a.  Plaintiffs and the other Contagious or Infectious Disease Coverage Declaratory Judgment Class members business income and extra expense losses incurred in connection with the suspension of operations due to the Closure Orders and/or adverse public communications or media reports regarding the actual or alleged exposure at the insured locations to COVID-19 and/or the Coronavirus are insured losses under the Policies; and

b.  State Auto is obligated to pay Plaintiffs and the other Contagious or Infectious Disease Coverage Declaratory Judgment Class members for the full amount of the Business Income Losses and Extra Expenses they incurred due to the actual or alleged exposure at the insured locations to COVID-19 and/or the Coronavirus following the suspension of operations due to the Closure Orders and/or adverse public communications or media reports.

## XI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.  Entering an order certifying the proposed nationwide Classes, as requested herein, designating Plaintiffs as Class representatives, and appointing Plaintiffs' undersigned attorneys as Counsel for the Classes;

b.  Entering judgment on Counts I-V in favor of Plaintiffs therein and the members of the Business Income Breach Class, the Civil Authority Breach Class, the Extra Expense Breach Class, the Sue and Labor Breach Class; and the Contagious or Infectious Disease Coverage Breach Class and awarding damages for breach of contract in an amount to be determined at trial;

c.  Entering declaratory judgments on Counts VI-X in favor of Plaintiffs therein and the members of the Business Income Declaratory Judgment Class, the Civil Authority Declaratory Judgment Class, the Extra Expense Declaratory Judgment Class, the Sue and Labor Declaratory Judgment Class and the Contagious or Infectious Disease Coverage Declaratory Judgment Class as follows:

    i.  Business Income, Civil Authority, Extra Expense, Sue and Labor and Contagious or Infection Disease losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

    ii.  State Auto is obligated to pay for the full amount of the Business Income, Civil Authority, Extra Expense, Sue and Labor and Contagious or Infectious Disease losses incurred and to be incurred related to COVID-19, the Closure Orders and the necessary

interruption of their businesses stemming from the COVID-19
pandemic;

    d.  Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded;

    e.  Ordering Defendant to pay attorneys' fees and costs of suit; and

    f.  Ordering such other and further relief as may be just and proper.

## VII.    **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated:  May 21, 2021               Respectfully submitted,

                                 */s/ Kenneth P. Abbarno*
                                 Kenneth P. Abbarno
                                 Mark A. DiCello
                                 Mark Abramowitz
                                 **DICELLO LEVITT GUTZLER LLC**
                                 7556 Mentor Avenue
                                 Mentor, Ohio  44060
                                 Telephone:  440-953-88
                                 kabbarno@dicellolevitt.com
                                 madicello@dicellolevitt.com
                                 mabramowitz@dicellolevitt.com

                                 Adam J. Levitt*
                                 Amy E. Keller*
                                 Daniel R. Ferri*
                                 Mark Hamill*
                                 Laura E. Reasons*
                                 **DICELLO LEVITT GUTZLER LLC**
                                 Ten North Dearborn Street, Sixth Floor
                                 Chicago, Illinois  60602
                                 Telephone:  312-214-7900
                                 alevitt@dicellolevitt.com
                                 akeller@dicellolevitt.com
                                 dferri@dicellolevitt.com
                                 mhamill@dicellolevitt.com
                                 lreasons@dicellolevitt.com

Mark Lanier*
Alex Brown*
Skip McBride*
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas  77064
Telephone:  713-659-5200
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com
skip.mcbride@lanierlawfirm.com

Timothy W. Burns*
Jeff J. Bowen*
Jesse J. Bair*
Freya K. Bowen*
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

Douglas Daniels*
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas  77057
Telephone:  713-917-0024
douglas.daniels@dtlawyers.com

Jeffrey P. Goodman*
Marni S. Berger*
Samuel B. Dordick*
**SALTZ MONGELUZZI & BENDESKY, P.C.**
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103
Telephone: 215-496-8282
rmongeluzzi@smbb.com
jgoodman@smbb.com
mberger@smbb.coms
sdordick@smbb.com

*Counsel for Plaintiffs*
*and the Proposed Classes*

*Applications for admission *pro hac vice* to be filed.